**Marcus AGUILERA, Plaintiff,**

v.

**COOK COUNTY POLICE AND CORRECTIONS MERIT BOARD, Defendant.**

**No. 77 C 3452.**

United States District Court, N.D. Illinois, E.D.

Feb. 16, 1984.

Alan Becker, Bowles, Becker & Levine, Chicago, Ill., for plaintiff.

Iris Sholder, Asst. State's Atty., Richard M. Daley, State's Atty. for Cook County, Chicago, Ill., for defendant.

MEMORANDUM OPINION

MAROVITZ, District Judge.

*Motion for Summary Judgment*

Plaintiff Marcus Aguilera, a Mexican American, brings this action under, *inter alia,* Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.* against defendant Cook County Police and Corrections Merit Board alleging that he has been denied employment because of his national origin in violation of federal law. The Court's jurisdiction is invoked under 42 U.S.C. § 2000e–2(a)(2) and 28 U.S.C. § 1343.

Aguilera originally charged that the defendant discriminated against him on the basis of national origin in refusing to hire him as a correctional officer. The original complaint alleged that defendant rejected his application solely because he did not possess a high school education or an equivalency certificate, and that because that requirement operates to disqualify a disproportionate amount of Spanish Surnamed Americans ("SSA's"), it violates Title VII. Judge Crowley granted summary judgment for plaintiff. *Aguilera v. Cook County Merit Board*, 21 F.E.P. Cases 732 (N.D.Ill.1979). The Seventh Circuit reversed and remanded, in an unpublished order, holding that Judge Crowley erred by comparing the number of hirees over a five month period to the number of applicants over a twelve month period, and by not considering defendant's evidence of business necessity. While the case was pending in the Court of Appeals, Aguilera was allowed to take the mental ability examination which is the next step in the application process. After failing this test, Aguilera amended his complaint to add a claim charging that the mental ability test also discriminates against SSA's. Finally, on August 11, 1983 plaintiff Aguilera added a third count to his complaint charging that defendant's employment practices violate Title VI of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000d *et seq. See Guardians Association v. Civil Service Commission of the City of New York,* —— U.S. ——, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). Presently pending before the Court are cross motions for summary judgment. After full review of the record and the memoranda on file, as well as the relevant case law, for the reasons set forth below, defendant's motion for summary judgment is granted.

## EDUCATION REQUIREMENT

The thrust behind Title VII is "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissable classifications."

> Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications ..... the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group.

*Griggs v. Duke Power Company*, 401 U.S. 424, 430–431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Aguilera's claim that the high school education requirement discriminates against SSA's does not involve an allegation of purposeful discrimination. Rather, Aguilera claims that the facially neutral qualification of a high school education or its equivalent operates to disproportionately exclude SSA's from eligibility for employment as a correctional officer.

■ To establish a *prima facie* case of discrimination, Aguilera need only show that the facially neutral employment standard selects applicants for hire in a significantly discriminatory pattern. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). This *prima facie* case may be established by statistics alone, but statistical evidence must be regarded with a substantial degree of caution. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). As the Court stated in *Teamsters*, "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances." *Id.* at 340, 97 S.Ct. at 1856–1857.

■ Once it is shown that the standard is discriminatory in effect, the burden shifts to the employer to show that the

requirement has a manifest relationship to the employment in question. *Griggs,* 401 U.S. at 432, 91 S.Ct. at 854. If the employer proves that the challenged requirement is job related, the plaintiff may then show that other selection devices without similar discriminatory effect would also "serve the employer's legitimate interest in efficient and trustworthy workmanship." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973).

This analytical approach is to be followed whether the decision is made upon a motion for summary judgment, or after trial on the merits. *Talev v. Reinhardt,* 662 F.2d 888 (D.C.Cir.1981). "But since summary judgment is appropriate only where 'there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law', the Court must ascertain at each successive stage whether any fact essential to the claim or defense is disputed and, if not, whether on the basis of the proffered evidence a summary disposition is legally demandable." *Id.* (footnotes omitted).

Applicants for the positions of correctional officer must be between 21 and 45 years old. The Court has not been presented with or found any statistics which accurately reflect the percentages of whites, blacks and SSA's in the Chicago Standard Metropolitan Statistical Area (or Illinois) between the ages of 21 and 45 who are thus qualified by age to hold the position and who have a high school education or its equivalent. Thus, it is not entirely clear to this Court that plaintiff can demonstrate that the high school education requirement has a disproportionate impact upon SSA's, especially in light of the fact that SSA's have the same educational opportunities as whites. Plaintiff relies upon the 1980 census data which indicates that 70% of all whites over the age of 25 and living in Cook County meet the education requirement and that 64% of the general population of Cook County over 25 meet the requirement, but that only 35% of all SSA's

over 25 and living in Cook County meet it. Thus the number of SSA's meeting the requirement is only 54% of that for the general population.

Defendant maintains that because the relevant age period is between 21 and 45, the use of statistics for persons 25 years and older is impermissible. First, the statistics do not include persons 21–24 years old, and, amongst minorities, this age group is most likely to have a high school education. *See Vulcan Society v. Fire Department,* 505 F.Supp. 955, 966 n. 6 (S.D. N.Y.1981). Second, the statistics include persons over 45 and defendant argues that older persons (especially minorities) are less likely to meet the education requirement. *Id.* This argument is supported by the 1970 census which is broken down into age brackets. However, the 1970 statistics do not include persons with a GED equivalency certificate, and thus cannot be used to determine if the requirement has a disproportionate impact upon SSA's. Therefore, if this Court was writing upon a clean slate, it would conclude that plaintiff has failed to present appropriate statistics sufficiently conclusive to prove a *prima facie* case of disparate impact.

However, the Court is not writing on such a clean slate. In its unpublished order reversing Judge Crowley, the Seventh Circuit stated that it was undisputed that SSA's are significantly less likely to possess high school degrees than are whites. The Court reached this conclusion by reviewing the 1970 census data for persons in the Chicago area over the age of 25. Based on the 1970 census, 31.3% of SSA's over 25 years of age are high school graduates while 53.9% of all persons over 25 are high school graduates and 58% of whites are high school graduates. As already stated, this Court is not convinced that statistics that consider persons outside the age qualifications for the position is conclusive as to whether SSA's have been disproportionately excluded by the educational requirement, especially in light of the fact that the 1970 statistics do not include persons who have obtained GED certificates

of equivalency. However, because of the Seventh Circuit order, the Court will *assume arguendo* that plaintiff's statistics prove a *prima facie* case of disparate impact.

Once it is shown that the high school education requirement is discriminatory in effect, the burden then shifts to defendant to show that the requirement is job related; that it has a manifest relationship to the employment in question. *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854. To establish the fact that a high school education is job related, defendant points to the wide ranging duties of a correctional officer which include knowledge and understanding of the rules, regulations and policies, writing reports, dealing with and communicating with inmates in routine and emergency situations, as well as assisting in rehabilitation. Appointees must go through ten weeks of special training which includes college courses in report writing, law enforcement, speech, and correctional law. Indeed, cadets are entitled to receive 12 hours of college credit for successful completion of the courses.

Plaintiff has not really presented any evidence to support the position that the requirement is not justified by a business necessity. Instead, plaintiffs have steadfastly maintained that because the high school education requirement has not been validated by empirically based studies adhering to the minimum validation requirements set out in the E.E.O.C. Guidelines, it cannot meet the business necessity test. 29 C.F.R. § 1607.5. Plaintiff relies upon the Supreme Court's decision in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) for his contention that the high school diploma requirement must be validated according to the E.E.O.C. Guidelines in order to be found to be job related. In *Albemarle Paper* the Court held that pre-employment tests which are found to be discriminatory are impermissible unless validated in accordance with the E.E.O.C. Guidelines. The purpose of the validation is to show that the test is predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which the candidates are being evaluated. *Id.* at 431, 95 S.Ct. at 2378.

■ The Court in *Albemarle Paper* dealt with pencil and paper tests. This Court is aware of no case which has held that the E.E.O.C. Guidelines apply to education requirements. Indeed, in *Griggs*, the Supreme Court indicated that the Guidelines do not apply to high school diploma requirements, at least with regards to § 703(h) of Title VII. 401 U.S. at 433 n. 8, 91 S.Ct. at 854 n. 8.

In fact, at least two courts have found a high school diploma requirement to be valid for police officers, without adherence to the Guidelines, even after *Albemarle Paper*. *United States v. City of Buffalo*, 457 F.Supp. 612 (W.D.N.Y.1978), mod. 633 F.2d 643 (2nd Cir.1980); *League of the United Latin American Citizens v. City of Santa Ana*, 410 F.Supp. 873 (S.D.Cal.1976). These Courts concluded that the high school requirement has been validated by meaningful studies of their relationship to job performance ability. The studies referred to are the 1967 report of the President's Commission on Law Enforcement and Administration of Justice, "The Challenge of Crime in a Free Society," at 106–110, its underlying "Task Force Report: The Police", at 126–128, and the subsequent 1968 "Report of the National Advisory Commission on Civil Disorders," at 106. These reports reached the conclusion that a high school education is a bare minimum requirement for successful performance of a policeman's responsibilities.

This Court is aware of the Supreme Court's statement in *Griggs*, that the Guidelines are the administrative interpretation of the Act by the enforcing agency and consequently they are entitled to great deference. *Griggs*, 401 U.S. at 433–34, 91 S.Ct. at 854–855. In *Griggs*, the Court struck down a high school education requirement for entry into certain departments of a private company. But in doing so, the Court did not base its decision on

the fact that no validation study had been made, nor did it ever indicate that the Guidelines were applicable to educational requirements. This Court agrees with the Court in *Santa Ana* when it stated:

This Court, therefore, is reluctant to accept the idea that education requirements must be empirically validated. To accept that concept would be to adopt the proposition that the empiricist's methods of arriving at truth are the only acceptable ones. It would involve the categorical rejection of reports of Presidential Commissions on the basis that they were "unscientific." Before this court will accept the notion that empirical methods of finding truth are the *sine qua non* of Title VII determinations (let alone Constitutional determinations), a clearer signal from the appellate courts will be required. It is one thing to say that paper and pencil tests must be validated by prevailing concepts of educational measurement (*Albemarle Paper Co. v. Moody*, supra, 422 U.S. at 431, 95 S.Ct. at 2378, 45 L.Ed.2d at 304); *it is quite another to say that the common sense judgment and reasoning of expert observers cannot be considered as relevant to the assessment of the value of institutional education to the increasingly complicated tasks of the police officer in an urban environment.*

*League of United Latin American Citizens v. Santa Ana*, 410 F.Supp. at 901. (emphasis added).

■ Defendant relies heavily upon the fact that the courts have upheld high school education requirements for police as job related. The job of correctional officer is, in many ways, comparable to that of a police officer. The type and level of training required of correctional officers, the duty to fill out detailed reports, the need to interact and communicate with inmates of diverse backgrounds are all functions that are similar to those of a police officer. And while it is true that correctional officers are not police officers, they are peace officers and law enforcement personnel and therefore authorized to carry firearms while on duty. Ill.Rev.Stat.1975, ch. 38

¶¶ 2–13, 7–9, 31–6, 24–2(a)(1). Additionally, both jobs contain a high potential for abuse due to the inherent power in the position. Because of the great similarity between the two positions, the Court concludes that defendant has carried its burden of demonstrating that the high school education requirement is job related.

As already stated, plaintiff has presented little or no evidence to indicate that a high school education is not job related. Nor has plaintiff shown the existence of other selection devices, without a discriminatory effect, that serve the legitimate interest in efficient and trustworthy workmanship. Accordingly, this Court concludes that the defendant is entitled to summary judgment on plaintiff's claim that the high school education requirement discriminates against him on the basis of his national origin.

## MENTAL ABILITY TEST

■ Because of the detailed procedural history of this case, the Court will analyze plaintiff's claim that the mental ability test discriminated against him on the basis of his national origin, despite the fact that the Court has already decided that defendant is entitled to summary judgment on plaintiff's high school education claim.

As previously noted, due to an earlier ruling, plaintiff was allowed to proceed to the second step in the application process while defendant appealed Judge Crowley's initial decision. The second step consists of a standard mental ability examination. Plaintiff failed the examination and immediately proceeded to amend his complaint to include a count charging that the test has a discriminating impact upon SSA's.

The evidence presented does not support plaintiff's claim. Plaintiff took the examination in June 1980. The 1980 statistics indicate that the pass rate for SSA's was higher than the overall pass rate.

| | PASSED | FAILED | PASSING RATE |
|---|---|---|---|
| Spanish Surnamed | 29 | 47 | 38.2 % |
| Overall | 582 | 1220 | 32.3 % |

**1058**

The statistics do not indicate that SSA's are being eliminated by the test at a disproportionate rate. Therefore plaintiff has not established a *prima facie* case under the *Griggs* standard. Accordingly, defendant is entitled to summary judgment on plaintiff's claim that the mental ability test has a disparate impact upon SSA's.

In summation, the Court concludes that: 1) plaintiff has not presented conclusive statistics indicating that the high school diploma requirement has a disparate impact upon SSA's; 2) even if the high school diploma requirement does have a disparate impact upon SSA's, the requirement has a manifest relationship to the employment in question; and 3) the mental ability test does not eliminate SSA's from the application process at a disproportionate rate. Accordingly, summary judgment is granted in favor of defendant and the case is dismissed.